Good morning, your honors, and may it please the court. I'm Elizabeth Newman, representing the appellant here, Marshall Zolp. Your honors, I'd like to focus on the loss issue today. Could you help me with something on the loss issue? That was actually my focus, too, in preparing the case. It looks to me as though a critical question is whether the suckers in the pump-and-dump scheme could actually sell the stock for anything after it was all over. Zolp says it still had value, so the judge erred in his calculation of loss. The judge said, in a finding of fact by clear and convincing evidence, that it had no value, so he would subtract zero. I looked at a kind of mysterious chart of values that showed that it had value, but I couldn't tell whether the suckers could sell the stock or whether this was just a couple of trades between insiders to trade around the incidents of the lawsuit and basically buy a lawsuit risk. I couldn't tell what it meant. Can the people that just bought the stock without being insiders get any money by selling it to anyone, or does the SEC suspension prevent them from selling the stock? Newman I'm really happy to hear the Court's question, because I do think that questions like that are exactly at the center of this appeal. Your Honor, the Court's question really points to the larger issue in the case. I think when preparing this argument and rereading our briefs, I think that both sides perhaps focused on some details in the case, but the larger issue in the case is, given that the chart, this mysterious chart, which begins at a point and ends at a point and we don't know what happened afterwards, shows that stocks were trading for money. Kennedy Well, it shows that after the critical time in February 2002, there were trades for money but very little volume. And I can't tell whether the suckers could trade it for money. Newman Right. And the district court I don't think could tell either. And that's the larger point, Your Honor, that this is a very undeveloped record. Kennedy Well, ordinarily I would infer from an SEC suspension of trading that they could not. So it has no value to them. Sometimes it's possible for somebody to have stock that he cannot trade. It has no value to him, but it may have value to somebody else. Newman Exactly, Your Honor. Kennedy Not just stock, all kinds of things. Newman Pet rock, for example, which might have no value, you know, to any person except the person who buys it and wants it for some design marketing reason. Kennedy A tiny landlocked parcel of a few square yards, no value to anyone except the adjacent gas station. Newman Exactly, Your Honor. Kennedy And so could these people sell the stock for anything? Newman You know, Your Honor, I would like to know the answer to that question. I don't know the answer to that question. Kennedy Isn't it your problem to look? Newman I don't see. Kennedy You're trying to show that the judge made a mistake in a clear and convincing finding of fact. Newman Right. But we have to find that he was clearly erroneous. Don't you have a burden to show us some evidence that he was? Newman Well, I don't think, with respect, Your Honor, I don't think that as a matter of answering the Court's specific question, could the investors who bought on the open market sell on the open market after February 1st, I think that that question is a little bit separate from what's our burden to show anything on appeal. Because I think the question on appeal is, here you have the district court who made a very clear finding in very uncompromising language, these stocks are worthless. That was the word the Court used. And so the question on appeal is, was there, did the government meet its burden below to persuade the Court by clear and convincing evidence that the value was actually zero? Kennedy It put in evidence that the SEC had suspended trading. Newman They did. Kennedy I understood that. Maybe I misunderstood it because I don't know enough about securities law. But I understood that to mean that one of the suckers who bought the stock high was now left with a worthless piece of paper because it was against the law to sell it. Kennedy Was that suspension a permanent suspension or a temporary suspension? Newman At the time, it looked like, well, it was... Kennedy At the time of trial, was it a... Permanent? Newman It was a permanent injunction. A permanent injunction was issued. So the stock has, you know, there is no trading. But, Your Honor, I think the question is, what did the evidence that the government presented to the district court show about the value of the stock? Kennedy I'm trying to understand what the record shows about suspension. If there were permanent suspension, I mean, I don't understand since there were trades here. Somebody was trading it. Newman Exactly. Somebody... Kennedy In the face of a suspension. My understanding of the record, it was a temporary suspension pending whatever further proceedings... Newman Right. Kennedy ...happen. So while it may be interrupting the current ability to trade...  Kennedy ...it's not clear that that would translate into absolutely worthless stock. Newman No, it's not. It's not clear. And, I mean, there is a possibility, of course, that people were still trading the stock in the hope that the suspension would be lifted, that stock trading would resume, and that the stock would regain some value. As I think we pointed out at one point in our briefs, there is evidence in the record that it does suggest that at least megawatt was doing what it said it was doing, that is to say, manufacturing solar generators. Kennedy Does a suspension mean no trading on recognized stock exchanges, or does it mean this is now close to being contraband? You can possess it, but you can't sell it. Newman Well, Your Honor, I think the term that's used in the papers below is a gray market. Excuse me. I'm sorry. Kennedy That's a very broad term. It can mean all kinds of things. Newman It can.  It's fine. It's perfectly legal to trade. Newman Yes. Kennedy And it doesn't necessarily mean that it's not a black market. It doesn't mean that it's not a gray market. It just means that Kodak meant that film for trade in Asia or Europe or some place in the U.S. Newman Exactly, Your Honor. And I think that the issue before the district court was what does this mean, and does a gray market stock share have actual value or no value. Kennedy Okay. What does it mean? Newman Well, I know only what's in the record, Your Honor, because I'm not an expert either. Kennedy Well, if you're going to show me that the district judge clearly erred, it would be a real help to show me what it means. Newman Well, I appreciate that, Your Honor. But I think that the question before the court is did the government present enough evidence to show that the district court was correct. Right? Kennedy Was there any evidence to the contrary other than this chart at SCR 125? Newman SCR 125 is correct. Kennedy Where did that come from? Newman The government submitted it in discovery, according to something that the parties said in open court below. So this is part of the government's evidence that it submitted as part of its case against Mr. Zolp. It showed that trading did continue. Kennedy Was the stock listed on the pink sheets? Newman The stock was listed on the NASDAQ exchange, which is where it was traded. Kennedy Right. And when the SEC issued its injunction, did the injunction continue all through the pendency of the litigation in the district court? Newman You know, Your Honor, I really apologize because I don't know the answer to that question. But I think, again, the question before the district court was does this stuff have value? Did it have value at any point? Kennedy But you're mistaking something, I believe, counsel. All of us are trying to understand where the value comes from. But your client, if nothing was said in the lower court and all the district court had to look at was what the government put in, then the clear and convincing evidence standard is a little easier to meet. On the other hand, if there is evidence that we can take notice of or there is something and the record has not been pointed out, then maybe we can do something different, because we realize it has a significant impact on the length of the sentence that your client received. But we can't just conjure this stuff out of thin air. We have to have evidence. Newman No, exactly, Your Honor. I think that the point, the broad point here is that the record is undeveloped. You have this chart on one side which says stock trading continued, sometimes at a volume of 40,000 shares a day, even after the suspension. Kennedy And where did that come from? Newman That chart? Kennedy Yeah. Newman That chart was submitted by the government to the defense as part of the pre-sentence discovery. Kennedy So are you suggesting that the chart that the government produced that showed up to $40,000 or 40,000 shares, excuse me, being traded is in itself evidence of value that the court failed to take into account? Is that your concept? Newman Yes. That's on one side. And on the other side, the government was saying, well, the chart doesn't mean what you might think it means by pointing to other things in the record. So that's what the district court was faced with, Your Honor. Kennedy Did anyone put in a declaration? Newman No, Your Honor. Kennedy All we've got is this. Newman You have the entire record before you, Your Honor, in these two volumes of excerpts. Kennedy Would you save a little time for rebuttal? This is just so confusing. Maybe you'll have some questions to answer then. Newman Thank you, Your Honor. But I would submit that a remand is necessary so that the district court can clear up this confusion. Kennedy Thank you, counsel. Newman Thank you, Your Honor. Ms. Lindsay May it please the Court, my name is Ellen Lindsay. I'm an assistant United States attorney in Los Angeles. And I'm responsible for the confusion below. And I'd like to say, first off, that I think it's very rude and unprofessional of counsel, opposing counsel, to give me her cold. It's all in the spirit of cooperation. It's nice that you're sharing. Just don't share it with us. Ms. Lindsay I hope that maybe I can clear up a little of this confusion. Kennedy Could you start with just, since you've now assumed responsibility, does that extend to the notion that the government does in fact bear the burden of showing that the stock is worthless? Ms. Lindsay Your Honor, certainly in the court below, the government bore the burden of proving the loss beyond, well, the government, we're still reserving the right to say that it's just preponderance, but under the laws it is now clear and convincing. What is very difficult in this case, I believe, and I think Judge Smith really hit on this, and that is what record was before the judge? Personally, I think the record now demonstrates that the, well, I prefer to call them victims rather than suckers, but that the victims of this offense could not sell their stock. And I'll explain that. Kennedy Much more refined. What does this chart on 125 mean? Ms. Lindsay Suckers. Oh, my God. I'm glad you're not one of my jurors. Anyway. Kennedy Don't count on it. The thing is, the way the record came out the way it is, is that the defense raised all kinds of different challenges to the loss calculation. And on appeal, only challenge is that one little thing, which is whether the stock was worthless  So below, what the defendant did was say, it's not worthless, and the reason it's not worthless is because of this chart that shows that there was all this, this is value up here, and this is volume down here. That looks like 40,000 shares traded at around, I don't know, 7, 7 1⁄2 in the middle of April, which is well after the February close of trade. Right. Is that what it means? Okay. I don't know what this is. Right. If I can explain it in just a second. What happened below was that the government responded, well, the chart shows all this volume here, I meant all this value, but the volume is extremely low. When you're talking about Anyway, look at the bumps there. Look at that bump around April 15th, at least if I'm reading it right, which I don't know. That's why I'm asking. Right. It means around 40,000 shares, and then you go up from there to see the price, and it looks like around 7 1⁄2. That's correct, Your Honor, but we're talking about 3.6, 3.7 million shares outstanding, and so But the chart said it was worthless. Right, and I'll address that. If I bought at 50 and it's now selling for 7 1⁄2, maybe I want to hold on on the gamble that they'll get out of the woods and it'll go back up into 40, 50, 60, 70 range. That can explain low volume on a legitimate stock. So you're not showing me that it's worthless by showing me that it trades at a low price and a low volume. If trading is prohibited, that's different. Right. Well, below what we did was there were not declarations, but there were memorandums of interview from the defendant who explained that, well, defendant raised the issue that the stock was worthless after the fraud was discovered. The government, and cited only this chart, the government responded by citing to the defendant's own statements that the volume was extremely low and the only people who were able to trade at that time were these insiders who were covering, able to cover people's shorts. And where did that come from? That came from the memorandums of interview of the defendant that were submitted. So it was Mr. Zulp himself who, according to your understanding of the record, indicated that it was only the insiders who were trading which would explain the low volume, but some value suggested in this. I gather this is SCR 125. Yes, exactly. And below, the defendant did not contest that. He never raised the issue again. I think I'm understanding something here. In a pump and dump scheme, it would be really smart for the insiders to sell short when they know they're going to make the top and then buy back after the stock crashes to sell the shorts. Are you saying that the purchases after February are short sellers covering their shorts? That's what the record shows, yes. He means shorts in a different sense than he might otherwise understand. Well, that, yes, Your Honor. How do you cover your shorts if trading is suspended? I thought if trading was suspended on an exchange, you couldn't buy, you couldn't sell. Yes. Let me clear that up, Your Honor. The trading was suspended and then it was, the suspension was released. Ah, critical. I'm sorry. I didn't bring that up right away. Yes. And you can see it here on the chart because there's this very high volume of trading and suddenly there's nothing and then it starts up again. But the, the, the. So when was suspension, so suspension was temporary. Yes. And then it was released the same month, sometime during February. Right. So then people could legitimately buy and sell the stock. Right. And it hung around two or three for a while and then it got up for a short time to maybe $8, $8.50 a share and then it settled around six. Well, see, that I think is exaggerated and it was explained below in the record that the reason it was so high is that people needed to cover their shorts and the only people who were available to sell the stock were these insiders, namely Lynn Stratford. That was the state of the record. The defendant did not contest that Lynn Stratford was an insider. He did not contest that. I would think you would need something more here. If it's legal to trade the stock and if it's being traded on the NASDAQ and trades are going forward, people are covering their shorts, then there's nothing to stop people that bought the stock for $50 calling up their brokers  And if a few thousand shares quickly depress the market to back down to $2 a share or less, that's still not worthless. It just means worth not very much, worth very little compared to what I paid for it. Right. Well, let me explain that in a couple of ways. The first way is that these victims were not sophisticated and that is also in the record. I don't see where that bears on whether the stock is worthless. Well, that they were unable, some of them didn't even get their shares, and that's also in the letters that they sent to the court, that they were not sophisticated. They didn't know how to go out there and find these brokers. How did they buy in the first place? I'm sorry? How did they buy in the first place? Because defendants solicited them. So these were direct sales by the? By the insiders, yes. And so these people were? All of this trading before was all just insider? Before. Sales. Yeah. Was Stratford also indicted? No, he was not, Your Honor. So he's someone out there trading. There's nothing illegal about what he's doing. Well, I wouldn't say that, Your Honor, because if you're talking about somebody who was able to see these press releases before the public saw the press releases. My point here, counsel, is simply to this issue of what is worthless. The reality is you're saying that Lynn Stratford and perhaps others was trading, admittedly, low volume, low price, but not worthless, perhaps even listed on the pink slips, pink sheets, rather. Right. Well, then let me say that, first of all, defendant below never gave, provided any evidence of what value it might have to victims, suckers, as opposed to insiders. And the guys? Did you present any evidence? What I would have expected, frankly, is a declaration by a specialist saying there is no market whatsoever at any price for this stock except to a few insiders covering their shorts, and they've already done that. Well, what we submitted, Your Honor, was the statement of the defendant, and then he did not contest it below. So once we answered with actually this chart shows that there was very little volume and defendant himself says the only trading there was as a result of insiders able to cover shorts, then the defendant never said another word about it. He didn't respond on paper, and he didn't bring it up before the district court. Show me what page to look for the critical words by the defendant. Okay. It would be in my brief. While I'm looking. I'm looking at the excerpts here. Yeah. If I can multitask and look and say also that any error, that there was a huge amount of wiggle room here, because the guideline cutoffs are $7 million up to $20 million. And the court found the loss to be $18 million, some odd. So we're talking about like $11 million leeway that the court had for any small value that the stock may have had before the next guideline step. The chart says that the stock is unchanged at 6, or the quotes are unchanged at 6. So if it was $6 a share, would it still fall in the $7 to $20 range of the $7 to $20 million range of loss? If it was $6 per share after, no, there wouldn't be any loss because the average loss or the average stock price during the fraud when it was pumped up was 5, 503. That was the defendant's figure that the government adopted. So that supports also that these numbers are very inflated by insiders who are holding back shares and just selling to people who had to cover shorts and therefore had to pay this. I want to be sure I understand something you mentioned, counsel. Did I understand you correctly that there is an $11 million delta, if you will, which if not exceeded would not affect the sentence of the defendant? Is that correct? Yes. The guideline cutoff is $7 million. It's $7 million to $20 million, and the Court found that it was $18 million. So it's really a huge disparity. It's a little frustrating, Your Honor, because as I said, the defendant did not contest what we said below. And it's only here that he's now challenging, for example, was Lynn Stratford an insider? You know, could the people not sell? Well, we present we – it was basically a proffer and out of the defendant's own mouth below, and he never contested it there. And certainly we would have presented more evidence had the defendant not apparently accepted what we said. Do you happen to have run across what the defendant said yet? Oh, sorry. I know you were flipping for it while we were chatting. I'm not very good at multitasking. Okay. It's in my response to the defense, and it was – Call off the excerpt page number, and I'll write it down and look at it. Okay. This is the defendant's response where he indicated that it was only the insiders who were trading. Is that what you're looking for? I'm trying to find where Marshall Zulp talks about it. You know, as a matter of fact, I think it's quoted. It may be quoted in the defendant's record, but it's in my response. Thank you. See, she gives me her call. She gives me sites. What are friends for, right? That's exactly right. It would be towards the bottom of that page. Okay. This looks like FBI agent or somebody writing down what happened in an interview. That's correct. And in our papers, here he's talking about the short sellers and how Stratford was selling to the short sellers. But in the papers, I also explained that that explains the very small amount of volume of trading that was going on. I still want to get back to this $11 million thing, because I had previously thought that this would make a significant difference. Is it because the court itself made a downward departure, a substantial downward departure? Is that the reason for the why this is such an insignificant thing, unless you have $11 million worth of losses? No. No, it isn't, Your Honor, because we're talking about just the guideline calculation before he made any departure. Right. And under 2B1.1, there's cutoff points for the loss. So if you have over 1.5 million, it's one thing and 2.5 million. Right. And it goes from 7 million to 20 million. That's one whole step. So, in other words, he would have to show that there's basically $11 million. That's only if you start at 18 million. The paragraph that you've shown us is about Lampert. Lampert did not have any other way of getting rid of the stock, so he's happy to sell it at $1. But Lampert is the Mexican insider. His situation in getting rid of the stock could be much more restricted than Amtler would. I'm sorry. I'm sorry, Your Honor. Let me see if this was ---- Well, what that supports, Your Honor, is that there was this short squeeze afterwards. It's what I proffer basically in my papers at GER 130. And it starts at the bottom paragraph. Well, that's just an argument. That's not any evidence. Well, I think the evidence was what defendants said about the trading, of what the trading was. And then he did not contest what I consider this to be basically a proffer, saying there was really no trading except what the insiders were doing. And the defendant never contested it, which would have given us the ability to then make more arguments. For example, this is basic supply and demand kind of economics. There's really no demand for it except, as we said, the short sellers. So if there's no demand, there's really no value to the stock. Would you agree, though, counsel, the judge characterized the stock as being worthless. Would you agree that the evidence that it was put on was very modest? Admittedly, the defense didn't come back with anything, but it was really modest. It's really hard to tell what it means. It was rather, I suppose under any circumstance, a weak showing as to what value there was and who was trading. I know that's what you're saying, that's what the defendants said. But the reality is that somebody was out there trading. There is very little under oath. I think what was quoted a little while ago was an FBI agent saying what he thought Zolp said. So to some degree, I suppose it's an admission against interest, but it's hearsay. I mean, it's just weak evidence. Would you agree with that? I don't think I would, and that's because I believe that the chart shows that the volume is so low. But it shows value. It shows value. Maybe a small, small, small amount of value. Maybe, you know, because what the government was saying was that it was virtually worthless. Even if there was some way that these insiders who didn't even have their stock certificate, I mean, sorry, these victims who didn't even have their stock certificates, if there's some way that they could have sold it, there's so little demand for it here. And what we said was the only demand was a few people out there who needed to cover their shorts, that there would be so little value to the stock that it wouldn't cover that whole 11 million. Can I finish on that part? I suppose we've probably beaten this into the ground about as much as we can, unless my colleagues have more questions. Thank you very much, Your Honors. Thank you, counsel. Thank you, Your Honor. I'd just like to begin by saying that opposing counsel hates me for giving her my cold, but I didn't give her my bronchitis. She should be grateful. And we're in courtroom one, so you won't get it either. I would take issue, Your Honor, briefly with one thing that opposing counsel said, and that is that below we never reasserted that the shares did actually have value or go back on a proffer or anything like that. Of course, we didn't go back on anything that we had proffered. But I would point the Court to the sentencing hearing. It's page of the unsealed excerpts, page 40, roundabout line 15. It's defense counsel talking, and he said, the Court has already commented, look, counsel, you've submitted a very long sentencing paper outlining your theory of loss and talking about why the other theories, the government's theory, the probation officer's theory, are, you know, should not be the theories that I adopt. The government, you know, has answered. I mean, it's been a very full set of briefings. Does anyone have anything to say? And so counsel is trying to accommodate the Court, read the Court, and be a little bit brief, but what he does say is the best figure that I can come up with that is reasonable, I didn't want to take a low figure, da, da, da. But basically, he reasserts in this paragraph what he says in his sentencing papers, which is to say the stocks did have value. And I think beyond that, Your Honor, I think that Judge Smith has hit it, the nail on the head, in saying that this paragraph on sealed excerpts 142, which is all about this, doesn't really say anything about duration, how, when did this occur, how long did it go on for, volume, what happened, or who these sellers were, I'm sorry, who these buyers were and why were they willing to pay for it, and what happened to the rest of these shares. This is not. I read the rest of that statement just now. It says the best figure I can come up with, being fair and everything, is a 16-level increase. It still doesn't tell me what the stock is worth. Is there more? It's only – well, you know, to go back and get a little bit detailed, Your Honor, the defense below had suggested that the Court's methodology should be to take the stock price before the fraud, the stock price over the course of the fraud, and use the inflated value multiplied by the number of shares. And so that was the defense methodology. And when the government came back and said, no, do it this way, the stock was absolutely worthless, the defense came back and is basically reasserting, no, Your Honor, I really think you should do it in the way that we suggested. But he's not saying, we agree that the stock was worthless. We agree that the only people selling were insiders or anything like that. And so I would take issue a little bit with opposing counsel on that. And I think that the Court's questions today and the Court's, you know, grappling with what happened in this case, what happened over the course of the fraud, who were these people who were trading, just shows that there's some real confusion in the record. The evidence is very inconclusive. And although the swing has to be big in order to get below a 20-level increase for loss, I mean, there were certainly other theories and other ways to do it. I mean, the defense theory. So your theory was puff value minus before and after value. Minus before value, Your Honor. Times shares sold. Their theory was puff value minus zero times shares sold. Precisely. The judge took their theory. That's how I read it, Your Honor. All I've got to determine whether there was enough of a basis for the judge's finding, not to be clearly erroneous, is that chart at page 120. Right, Your Honor. Plus, I mean, the chart is there. The government says, well, the chart doesn't mean what, you know, you might think it means. These shares didn't actually have volume, even though this chart says they were trading at 6,500, 7,500, 8,000 on a volume of sometimes 40,000. The chart doesn't show a value of 6,000, even though that's the quote. Right. Because there are not a significant number of trades at 6,000. Right. Even though it's 40,000 shares on a very small-cap company. I mean, this wasn't General Electric. And I think that, I mean, when you look at what this case – when you look at this case, I mean, the first thing that jumped out at me preparing was people were buying it, and it's sort of a classic measure of value that people were paying money for it. It's really unclear from this record how the district court decided what it did. I won't take up the Court's time anymore. Thank you, Your Honors. Thank you. And stay in good health. Unless my colleagues have more questions, United States v. Zolp is submitted.
judges: Kleinfeld Fisher, Smith